UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>LYNN CLARK,<br><br>Defendant. | Criminal No. 3:22-30012-MGM |

MEMORANDUM AND ORDER REGARDING MOTION TO SUPPRESS
(Dkt. No. 48)

July 21, 2023

MASTROIANNI, U.S.D.J.

Defendant, Lynn Clark, moves to suppress statements she made on April 6, 2022 in response to questions posed to her by law enforcement as well as any evidence obtained from the use of her statements, including the contents of her personal cellphone and laptop. She argues her rights under the Fifth and Sixth Amendments to the U.S. Constitution were violated when an FBI agent asked her for the passcodes to her personal cellphone and laptop. The government alternately asserts: (1) Defendant voluntarily waived her *Miranda* rights when she made her statements, (2) Defendant's Sixth Amendment right to counsel had not attached when she made her statements, (3) Defendant voluntarily waived her Sixth Amendment right to counsel when she made her statements, (4) the exclusionary rule does not apply to material obtained using Defendant's statements, and (5) the government would inevitably have discovered the contents of Defendant's cellphone and laptop regardless of Defendant's statements. A hearing was held, and, for the reasons that follow, the court grants Defendant's motion with respect to both her statements and the contents of her personal cellphone and denies the motion with respect to the contents of her laptop.

1

I.       FINDINGS

At the evidentiary hearing, the government called as witnesses FBI agents Erin O'Brien,

Justin Farivar, and Ian Smythe. Defendant did not call any witnesses. Based on the evidence

presented at the hearing, the court finds the following facts. On April 5, 2022, a group of FBI agents

attended a briefing regarding a plan to arrest Defendant and execute search warrants authorizing the

search of her cellphone and computer at her residence early in the morning on April 6, 2022. During

that briefing, the agents learned Defendant's identity, that she presented a low threat risk to agents,

and was already represented by counsel. As Agent O'Brien explained, Defendant's status as a

represented party was important information that informed agents of the need to be mindful not to

ask Defendant questions related to the investigation while executing the warrants.

The following morning, approximately twelve FBI agents arrived at Defendant's home

between 6:25 and 6:30 in the morning. The agents wore ballistic vests and carried handguns. About

five agents positioned themselves near Defendant's front door and knocked. They announced their

presence and asked Defendant to come to the door. A minute or two later, Defendant came to the

door wearing a nightgown and a single sock. Agents immediately placed her in handcuffs and walked

her from her porch to an area near her garage. One agent asked Defendant questions related to her

health while other agents conducted a sweep of her home. During this initial period, Agent O'Brien

observed that Defendant appeared to be frazzled and overwhelmed, but was alert and coherent.

Defendant provided appropriate answers to questions about her health and confirmed that she was

not experiencing any medical issues.

After approximately ten minutes, several agents escorted Defendant back into her house and

directed her to sit on a couch in her living room. Agent Farivar then provided Defendant with her

*Miranda* warnings using a standard form, FD-395, titled "Federal Bureau of Investigation Advice of

Rights," and last revised in 2002. (Gov. Ex. 1.) The agents testified that Defendant remained

handcuffed either in front or behind her back during the entire *Miranda* process. This process was

observed by Agent O'Brien and Agent Morin, and formally witnessed by Agent Tim Barth. There

was no evidence that any audio or video recordings of the interactions were made. The form has

four sections. In the first section, headed "Location," Agent Farivar filled in Defendant's address, the date, and the time.[1] Agent Farivar then read Defendant the second and third portions of the form. While reading the form to Defendant, Agent Farivar observed Defendant listening and nodding. The second section of the form, entitled "Your Rights," advised Defendant of her rights, including "the right to remain silent," "the right to talk to a lawyer before we ask you any questions," and "the right to have a lawyer with you during the questioning." (*Id.*) There is no signature line in this second section for a person to acknowledge receipt and understanding of their *Miranda* rights. After reading this list of rights, Agent Farivar continued and read Defendant the third section of the form, headed "Consent." This section contained two sentences followed by a signature line. The two sentences were: "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." (*Id.*) When he concluded reading the form, Defendant responded by saying "yes." Agent Farivar understood her "yes" to mean she had heard and understood all of her rights. Neither Agent O'Brien nor Agent Farivar believed that Defendant was waiving any rights with her response. Agent Barth initially wrote "Verbal Consent" on the signature line, but the word "Consent" was later scratched out and replaced with the word "Acknowledgment."[2] At the hearing, Agent Farivar testified that the correction, which was initialed by Agent Barth, was made for accuracy because Defendant had not consented to answer questions without an attorney present, but only acknowledged receiving and understanding her rights.

The fourth section of the form, headed "Witness," had two lines for witness signatures. Agent Farivar signed the first line and he then handed the form to Agent Barth, who signed the second line. Shortly after Agent Farivar handed off the form, Defendant asked if she could call her attorney. She was told that she would be permitted to do so, but only after she was taken to the

---

[1] Agent Farivar initially recorded the time as 6:42, though Agent Barth corrected the time to 6:41 AM, approving the correction with his initials and the date.

[2] As with the changed time in the "Location" section of the form, the replacement of the word "Consent" with the word "Acknowledgment" was initialed by Agent Barth.

courthouse, even though she was to be taken first to the FBI office. The exchange regarding Defendant's rights lasted approximately two minutes and Defendant remained in handcuffs the whole time. Consistent with Agent Farivar's understanding that Defendant had not consented to answer questions without her lawyer present, none of the agents asked her any questions about the investigation during the time she remained seated on the couch. At no time did any agent explicitly ask Defendant if she wanted to answer questions or give a statement.

Several minutes later, Agent O'Brien and Agent Morin accompanied Defendant to her bedroom where she was permitted to select clothing. The agents removed her handcuffs and she was permitted to get dressed. After she was dressed, but while she was still in her bedroom, Agent Barth entered the room with Defendant's cellphone and laptop. Without any reference to Defendant's *Miranda* rights or the earlier *Miranda* warnings delivered by Agent Farivar, Agent Barth asked Defendant for the passcode to her cell phone. Defendant gave a passcode and Agent Barth entered it into the phone. When the passcode did not work, he requested Defendant provide a different passcode. Agent O'Brien reported that Defendant eventually gave Agent Barth the correct passcode for her cellphone, but she did not recall whether Defendant provided the correct code the second time Agent Barth asked or after providing two or more incorrect passcodes. Once Agent Barth had obtained a passcode for the cell phone, he asked Defendant to provide a passcode for her laptop. Again, Defendant initially provided an incorrect passcode, but then provided the correct passcode in response to an additional question from Agent Barth. Agent O'Brien described the demeanor of Defendant and Agent Barth as calm, but also said Defendant seemed flustered during the exchange. After obtaining the passcodes from Defendant, Agent Barth left her bedroom and, a short time later, Defendant, accompanied by Agent O'Brien, also left her bedroom. Agent Barth was not called as a witness at the evidentiary hearing.

Agent O'Brien remained with Defendant until Defendant was transported to the FBI office in Springfield. During that time, Agent O'Brien did not ask Defendant any questions and did not observe other agents asking Defendant questions. On several occasions, Agent O'Brien or another agent responded to unprompted remarks made by Defendant, none of which were related to the

4

subject of the investigation. Agent O'Brien specifically recalled Defendant expressing concern that her son might learn of her arrest if the agents were communicating on open channels used by first responders. Another agent assured her that the team was not using an open channel and Agent O'Brien observed that Defendant seemed relieved by this information. Agent O'Brien also remembered advising Defendant not to do anything unnatural in response to Defendant asking whether she should be crying.

Defendant was at the FBI office for about an hour before she was transported to the federal courthouse. There was no testimony explaining the time she spent at the FBI office, other than describing possible time needed for fingerprinting. She was not asked any questions about the investigation while she was at the FBI office, but also was not given an opportunity to contact her attorney in a timely way, even though landline telephones were available, agents specifically knew she was represented, and she had asked at the scene to call her lawyer.[3]

The FBI obtained evidence from Defendant's laptop and cellphone using the passcodes she provided to Agent Barth. At the hearing, Agent Smythe testified that he has extracted data from hundreds of cellphones and laptops. He explained that the FBI's ability to access data on cellphones depends on the type of device and the user's settings. Defendant's cellphone was an iPhone 12 or iPhone 13 and it was running iOS 15. Agent Smythe testified that the FBI's ability to access user data on an iPhone 12 or 13 running iOS 15 depends on whether the phone is configured to open using biometric data or a passcode. He explained how the FBI can access some data using a suspect's biometric data if the iPhone has been set up to open in that way and the FBI has a warrant allowing use of biometric access. In this case, the warrant did allow the FBI to use biometric data, but there was no evidence presented that any effort was made to open the phone in that way or that biometric access was enabled on the phone.  If biometric access is not enabled on an iPhone 12 or

---

[3] Law enforcement may view the passage of idle waiting time as a tactical means to prompt a person to initiate a conversation about the alleged criminal conduct on their own, without any actual questioning. The court observes, however, that this practice may implicate due process considerations when a defendant has clearly requested to speak with an attorney.

13 running iOS 15, the FBI does not currently have the capability to access most data without a valid passcode.[4] The FBI has tools that enable agents to access data on older iPhones running older versions of iOS and Agent Smythe expects that in the "future" the FBI will be able to access data on an iPhone 12 or 13 running iOS 15. However, he could not estimate whether the "future" he referenced was months or years away.

Agent Smythe was less familiar with Defendant's laptop, but thought her laptop was a consumer-grade computer running a version of Windows. Typically, FBI agents can extract data from laptops running Windows regardless of whether they have the user's passcode. He explained that in rare cases the FBI is not able to access data from certain high-end machines where device security and encryption and the main CPU have been separated onto different processors. There was no evidence at the hearing suggesting Defendant's laptop had the type of security features that could have prevented the FBI from accessing user data without the passcode.

## II.  DISCUSSION

Defendant has asserted that Agent Barth's request for her passcodes violated her rights under both the Fifth and Sixth Amendments. The Fifth Amendment protects against compelled self-incrimination and, under *Miranda* and its progeny, courts have recognized a Fifth Amendment right to counsel that suspects may invoke during custodial interrogation. *Johnston v. Mitchell*, 871 F.3d 52, 57 (1st Cir. 2017). Separately, the Sixth Amendment provides defendants with a right to the assistance of counsel that attaches when an "investigation gives way to a prosecution." *United States v. Boskic*, 545 F.3d 69, 81-84 (1st Cir. 2008) (holding that "under federal law, the complaint is not a 'formal charge' in the relevant sense for triggering the Sixth Amendment right to counsel."). As the First Circuit has explained, while access to counsel may be helpful during custodial interrogations, those typically occur before the Sixth Amendment attaches and "suspects must instead rely on the Fifth Amendment and the prophylactic, now constitutionalized rule of *Miranda*." *Id.* at 83-84. The

---

[4] The government has indicated it is not relying on a biometric access theory in any part of its opposition to the suppression motion.

6

court finds that on the morning of April 6, 2022, the case against Defendant was still in the investigative phase and her Sixth Amendment right to counsel had not yet attached. For this reason, the court addresses only Defendant's Fifth Amendment arguments.

A. *Miranda* Violation

"*Miranda* and its progeny require that law enforcement officers provide warnings concerning certain Fifth Amendment rights — including the right to remain silent and the right to consult an attorney — before interrogating a suspect in a custodial setting." *United States v. Carpentino*, 948 F.3d 10, 20 (1st Cir. 2020). An "[i]nterrogation for *Miranda* purposes includes 'any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Sanchez*, 817 F.3d 38, 44 (1st Cir. 2016) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). "Where a suspect asserts his right to counsel or to remain silent, further interrogation may not take place 'unless the accused himself initiates further communication, exchanges, or conversations with the police." *United States v. Thongsophaporn*, 503 F.3d 51, 55–56 (1st Cir. 2007) (quoting *Edwards v. Arizona*, 451 U.S. 477, 485 (1981)). By protecting a suspect's "right to cut off questioning," the *Miranda* doctrine empowers "a suspect [to] 'control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation,' all of which 'counterac[t] the coercive pressures of the custodial setting.'" *Id.* at 56 (quoting *Michigan v. Mosely*, 423 U.S. 96, 103-04 (1975)) (second alteration in original).

In this case, Defendant was clearly in custody when she interacted with agents on April 6, 2022. There is also no dispute about whether agents provided her with *Miranda* warnings before she was questioned; they clearly did. Agent Barth's requests for Defendant's passcodes also clearly constituted an interrogation, as the term is defined for *Miranda*. The issues presented here concern Defendant's response to the *Miranda* warnings—whether, as the government contends, she validly

waived her rights before answering Agent Barth or, as Defendant contends, she never waived her rights and, in fact, invoked her right to counsel prior to Agent Barth's questioning.

The first area of disagreement between the parties concerns whether Defendant waived her *Miranda* rights and consented to answer questions after Agent Farivar read her the FD-395 form. A *Miranda* waiver is only valid it if is "both voluntary, and knowing and intelligent." *United States v. Bezanson-Perkins*, 390 F.3d 34, 39 (1st Cir. 2004). When assessing the validity of a *Miranda* waiver, this court "must start with a presumption that the suspect did not waive [her] rights and the government bears the burden of showing the validity of the waiver by a preponderance of the evidence." *Carpentino*, 948 F.3d at 26.

At the hearing, Agent Farivar testified that he read Defendant the list of rights and then the consent language on the FD-395 and that she responded by saying "yes." The government argues Defendant's "yes" indicated that she was waiving her rights. The court does not agree. Rather than ask a suspect to affirm receiving and understanding their *Miranda* rights and then separately ask whether the suspect consents to waive their rights, the FD-395 combines the two inquiries in one "Consent" section. The two sentences under the "Consent" heading state: "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." These two distinct sentences are followed by a single signature line which Defendant did not mark in any way. Since the form has only one signature line, which appears at the end of the "Consent" section, there is no obvious and unambiguous way of using the form to indicate that a suspect read or was given *Miranda* warnings, understands them, and is exercising, rather than waiving, their rights. There was no evidence that Defendant was actually looking at the document to observe its format or to read along. There also is no recording of the interaction or testimony to explain how the agent enunciated, phrased, or punctuated the content of

the form when reading it to Defendant.[5] Additionally, Defendant remained handcuffed, although deemed a low risk, and was not allowed to actually write on the form. Given the ambiguity created by the unnecessarily confusing and flawed design of the FD-395, Defendant's verbal response is insufficient to satisfy the government's burden to rebut the presumption against waiver.[6] Further, all the other evidence clearly supports the presumption that Defendant did not waive her rights.

Beyond the shortcomings of the form, the agents involved clearly understood that Defendant had *not* waived her rights at that time. As Agent Farivar explained, in the context of the FD-395, the phrase "verbal consent" indicates a suspect agrees to answer questions and Agent Barth had replaced the word "consent" with the word "acknowledgment" because Defendant had received and understood her rights, but had not agreed to answer questions. The agents' conduct also confirmed their understanding that Defendant had not consented to answer questions. Moreover, Agent O'Brien testified that agents were informed at the briefing that Defendant had counsel and they were cautioned to limit their questions because she was represented. She described asking Defendant only questions related to helping her get ready to leave her home and being careful when responding to Defendant's unprompted statements. Considered together, the evidence at the hearing clearly established that when Agent Farivar read the FD-395 to Defendant, she affirmed that she understood her rights, but did not waive her *Miranda* rights or agree to answer questions.

The government has alternatively argued that even if Defendant did not waive her *Miranda* rights when she was read the FD-395 form, she later communicated a valid waiver when she chose to answer Agent Barth's questions. Defendant counters that she invoked her right to counsel when she asked to call her attorney. As a result, she contends, Agent Barth was not permitted to request

---

[5] The FD-395 is actually designed to be read by the person being advised of their rights as evidenced by the text preceding the only signature line, which begins "**I** have read my statement of rights and **I** understand . . ." (emphasis added).

[6] As Agent Farivar testified, he was looking for a verbal or other acknowledgment from Defendant of the understanding of her rights and the FD-395 made the agent's duty unnecessarily complicated.

her passcodes until she had been given an opportunity to talk with her attorney or she initiated

further communication about the case and waived her rights, neither of which occurred before he

asked for her passcodes.

In order to invoke her right to counsel, a "suspect must unambiguously request counsel."

*Obershaw v. Lanman*, 453 F.3d 56, 64 (1st Cir. 2006) (quoting *Davis v. United States*, 512 U.S. 452, 459

(1994)). The court applies an objective test when determining whether a suspect has clearly

requested an attorney or has merely made "a reference to an attorney that is ambiguous or

equivocal." *Id.* (quoting *Davis*, 512 U.S. at 459). The test is satisfied if "the suspect has 'articulate[d]

his desire to have counsel present sufficiently clearly'" that, given the circumstances, a reasonable

officer would have understood that the suspect had requested an attorney. *Id.* (quoting *Davis*, 512

U.S. at 459) (alteration in original).

The First Circuit has sometimes found that even questions like "can I talk to a lawyer first"

or "do I need a lawyer" may not be sufficiently clear to invoke the right to counsel, but those cases

involved situations quite different from this case. For example, in *Obershaw*, the First Circuit affirmed

a state court finding that a defendant, who had previously signed a written *Miranda* waiver, had not

unambiguously invoked his right to counsel when he responded to a question by asking, "[c]an I talk

to a lawyer first," because the defendant then declined an offer to use a telephone to call an attorney

and later initiated further conversation with police. *Id.* at 64-65. Similarly, the First Circuit found a

defendant had not unambiguously invoked his right to counsel when he made statements such as "I

need to speak to a lawyer" and later asked "do I need a lawyer" because he kept talking,

unprompted, despite the questioning agent offering to end the interrogation after each statement.

*United States v. Sweeney*, 887 F.3d 529, 535-36 (1st Cir. 2018).

At the hearing, both Agent O'Brien and Agent Farivar testified that right after

acknowledging that she understood her rights, Defendant asked if she could call her attorney. The

agents knew she was already represented by an attorney and that she had not consented to answer questions. Agent O'Brien and Agent Farivar did not describe Defendant doing anything on the morning of April 6, 2022 that even arguably indicated she wished to talk about the investigation without her attorney present. In these circumstances, a reasonable officer would have understood Defendant's request to call her attorney was an assertion of her right to counsel sufficient to require that agents refrain from asking Defendant any additional questions until she had an opportunity to consult with her lawyer or she initiated further communication about her case. *See, e.g.*, *Obershaw*, 453 F.3d at 64; *Sweeney*, 887 F.3d 535-36. Since Defendant invoked her right to counsel, Agent Barth inexplicably entering the bedroom and launching what was technically an interrogation regarding her passcodes violated *Miranda*. *Carpentino*, 948 F.3d at 26 ("[L]aw enforcement officers may not continue to interrogate a suspect in custody who has invoked his right to counsel until an attorney is present.").

B.  Suppression

Having determined that Agent Barth violated *Miranda*, the court must next consider whether her statements identifying her passcodes, and the material obtained using those passcodes, should be suppressed. The exclusionary rule generally requires suppression of evidence tainted by violations of the Fifth and Sixth Amendments. *Nix v. Williams*, 467 U.S. 431, 441-42 (1984). Though "drastic and socially costly," the Supreme Court has explained that the exclusionary rule is "needed to deter police from violations of constitutional and statutory protections" that might, otherwise, put the prosecution "in a better position than it would have been in if no illegality had transpired." *Id.* at 442-43. The Supreme Court has not extended the exclusionary rule to voluntary statements made without proper *Miranda* warnings, because the "mere failure to give *Miranda* warnings does not, by itself, violate a suspect's constitutional rights or even the *Miranda* rule" and so does not justify such a

broad suppression rule. *United States v. Patane*, 542 U.S. 630, 641 (2004). Voluntary statements obtained in violation of *Miranda "*can be used to impeach a defendant's testimony at trial" and "nontestimonial fruit of a voluntary statement" may be introduced at trial. *Id.* at 639, 643. On the other hand, involuntary statements are subject to the exclusionary rule and evidence derived from those statements cannot be used in a criminal case against that defendant. *Id.* at 640.

Pointing to Defendant's intelligence, her calm demeanor, and the agents' civility, the government urges the court to find Defendant's responses to Agent Barth were voluntary and, therefore, not subject to the exclusionary rule. However, since the court has found Defendant invoked her Fifth Amendment right to counsel before she was questioned by Agent Barth, the court presumes her answers were involuntary. *Carpentino*, 948 F.3d at 21 (explaining that once a suspect in custody invokes their right to counsel, "[a]ny subsequent questioning at the officers' behest without a lawyer present is impermissible because, even if the officers obtain a *Miranda* waiver, that waiver is presumed to be involuntary."); *see also Obershaw*, 453 F.3d at 64 ("[O]nce a suspect 'expresse[s] his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.'" (quoting *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)) (first alteration added)). The presumption of involuntariness could be overcome with evidence that Defendant had initiated investigation-related communication with the agents after she asked to call her attorney and before Agent Barth asked for her passcodes. *Carpentino*, 948 F.3d at 21-22. However, in the absence of any such evidence, the court concludes her statements were not voluntary and the exclusionary rule bars all use of the statements and evidence obtained through use of the passcodes.

Finally, the government argues evidence obtained from Defendant's cellphone and laptop is admissible pursuant to the inevitable discovery exception to the exclusionary rule. The inevitable

discovery doctrine provides "that evidence that 'would inevitably have been discovered without reference to the police error or misconduct' may be admitted at trial" even if the actual discovery of the evidence was tainted by unlawful conduct. *United States v. Hughes*, 640 F.3d 428, 440 (1st Cir. 2011) (quoting *Nix*, 467 U.S. at 448). The Supreme Court has explained that the deterrence rationale underlying the exclusionary rule is too attenuated in such cases to justify the "enormous societal cost of excluding truth in the search for truth in the administration of justice." *Nix*, 467 U.S. at 445. Courts apply the inevitable discovery rule when necessary to ensure "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced." *Id.* at 443. Proper balance is achieved when the prosecution's position is neither better nor worse than it would have been in the absence of the constitutional violation. *Id.* at 443-44.

Evidence discovered through the use of an unlawfully obtained statement is admissible under the rule "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Id.* at 444. "In evaluating inevitable discovery claims, [this court] ask[s] three questions: first, whether the legal means by which the evidence would have been discovered was truly independent; second, whether the use of the legal means would have inevitably led to the discovery of the evidence; and third, whether applying the inevitable discovery rule would either provide an incentive for police misconduct or significantly weaken constitutional protections." *United States v. Almeida*, 434 F.3d 25, 28 (1st Cir. 2006).

Alternate legal means for discovering evidence are "truly independent" if law enforcement would have employed them absent the unlawful conduct by law enforcement. *See United States v. Delgado-Pérez*, 867 F.3d 244, 258 (1st Cir. 2017); *see also United States v. Zapata*, 18 F.3d 971, 978 (1st Cir. 1994) (concluding an independent legal means of discovery existed for certain evidence

discovered during an unlawful vehicle search because the vehicle would have been impounded for unrelated reasons and then subjected to a routine inventory search). Discovery through independent legal means is inevitable if "'demonstrated historical facts' shown by a preponderance of the evidence . . . show that the evidence would have come to light through lawful means." *United States v. Del Rosario*, 968 F.3d 123, 130 (1st Cir. 2020) (rejecting government's assertion that illegally obtained evidence would inevitably have been discovered in a separate, lawful, search where officers testified at trial that they had not intended to conduct such a search). While the government is not required to "prove to a certainty what would have happened but for the illegally obtained admission," it must show "a high probability that the evidence would have been discovered." *United States v. Rogers*, 102 F.3d 641, 646 (1st Cir. 1996).

Applying the inevitable discovery doctrine in this case, the court finds evidence obtained from Defendant's laptop is admissible, but evidence obtained from her cellphone is not. The relevant warrant authorized agents to search the contents of Defendant's electronic devices, including her laptop and cellphone. Agent Smythe testified that he routinely discovers data on locked electronic devices using a variety of tools. This evidence is sufficient to establish that if Agent Barth had not obtained Defendant's passcodes, the FBI would have tried to access the devices using other means.

The FBI currently possesses tools that enable agents to access user data on almost all Windows laptops, without needing the user's passcode. Agent Smythe's testimony about his successful use of those tools is sufficient to establish a high probability that the FBI would have been able to access the user data located on Defendant's laptop, even if Agent Barth had not obtained her passcode. Additionally, applying the inevitable discovery doctrine to the laptop is unlikely to incentivize future misconduct or erode constitutional protections. No evidence at the

hearing suggested the investigation developed differently because Agent Barth obtained the passcode to the laptop than if the FBI had to use other methods to access the laptop data.

In contrast, Agent Smythe testified that the FBI was not able to independently access the user data on Defendant's cellphone at the time of the search and, more than a year later, still lacked that capability at the time of the hearing.[7] While he expressed confidence that the FBI will eventually, at some unidentified future date, have the necessary tools, he could only speculate about the timeframe. Regardless of how probable it might seem to law enforcement that they will one day possess the necessary technical tools to independently access the evidence on Defendant's cellphone, a future possibility does not demonstrate inevitability for purposes of this legal doctrine. Within the context of the doctrine, discovery of evidence is inevitable only when the government can demonstrate that it would have been found "in the course of a proper investigation." 2A C. Wright & A. Miller, *Fed. Prac. & Proc. Crim.* § 408 (4th ed. 2023 update). Currently, unless the government uses the passcode improperly obtained from Defendant, it has no investigatory means to access the evidence on her phone. *See Almeida*, 434 F.3d at 28. Applying the inevitable discovery rule in these circumstances would impermissibly reward the government for Agent Barth's unlawful interrogation and encourage law enforcement to take similar illegal shortcuts in the future. *Id.* Here, suppression, not admission, satisfies the purposes underlying the exclusionary rule and inevitable discovery exception, ensuring the government has the same access to evidence, no more and no less, that it would have had if Agent Barth had not impermissibly requested Defendant's cellphone passcode.

---

[7] Since the FBI lacks the tools necessary to discover the user data on Defendant's cellphone, the government has not shown that it ever possessed an independent capability to access the cellphone evidence during the investigation or even the period of prosecution.

V. CONCLUSION

For the foregoing reasons, the court ALLOWS Defendant's Motion to Suppress as to her statements regarding her passcodes and as to evidence obtained using the passcode for her cellphone and DENIES the motion as to evidence obtained from her laptop (Dkt. No. 48).

It is So Ordered.

  /s/ Mark G. Mastroianni        
MARK G. MASTROIANNI
United States District Judge